E-FILED
Monday, 03 January, 2022  10:08:55 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DANIEL P. RUMPF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3185 |
| | ) | |
| KILOLO KIJAKAZI,[1] Acting | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Daniel P. Rumpf appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Rumpf filed a Brief in Support of his Motion for Summary Judgment (d/e 15).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  Rumpf also filed a Reply Brief (d/e 20).  This matter is before the Court for a Report and Recommendation.  For the reasons set forth below, the Decision of the Commissioner should be AFFIRMED.

---

[1] The Court takes judicial notice that Kilolo Kijakazi is now Acting Commissioner of Social Security.  As such, he is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

## BACKGROUND

Rumpf was born on August 24, 1982.  He secured an Associate Degree in Fire Science and previously worked as an automobile-accessories installer, medical services sterilizer, mold polisher, lubrication technician, and retail stock clerk.  Rumpf alleged that he became disabled on April 6, 2017 (Onset Date).  Rumpf suffered from fibromyalgia; chronic fatigue syndrome; headaches; allergic rhinitis; degenerative disc disease, status post C6-7 fusion; mood disorder; and anxiety disorder.  Certified Transcript of Proceedings before the Social Security Administration (d/e 10 and 11) (R.), 15,18, 26, 39.

## STATEMENT OF FACTS

### Evidence Submitted Before the Evidentiary Hearing

On August 11, 2016, Rumpf saw neurologist Dr. Dennis W. Ozment, M.D., for a consultation on diffuse arthralgias.  R. 281-82.  Rumpf reported that he had diffuse joint pain that was becoming more severe.  He had morning stiffness for several hours, and said he was exhausted during the day.  On examination, Rumpf was alert, oriented and in no acute distress.  His extremities showed no clubbing, cyanosis, or edema, and no synovitis was present.  Dr. Ozment assessed joint pain and sleep disturbance.  R.

281. Dr. Ozment ordered an overnight pulse oximeter and noted, "This might be fibromyalgia."  R. 282.

On March 23, 2017, Rumpf saw primary care physician Dr. Alan Richardson, M.D.  He reported fibromyalgia pain, not sleeping well, and feeling like he was in a fog all the time.  He appeared fatigued with an unsteady gait.  Dr. Richardson noted that in the past he recommended that Rumpf get an HIV test, but Rumpf did not do so.  R. 332.  On examination, Rumpf was in no acute distress.  He had accurate finger to nose movement, no obvious tremor or spasticity, and Romberg's test was negative.  His gait was slow and he had difficulty tandem walking.  His legs were weak with 3+/5 strength.  Dr. Richardson ordered a neurological consult and an MRI of his brain.  R. 334.

On April 26, 2017, Rumpf saw neurologist Dr. Austin Hake, M.D., for a consultation for weakness and fatigue.  Rumpf reported that he had fatigue for the past year.  He had cramps, spasms, and stiffness in his hands and the symptoms had become worse over time.  He reported diffuse pain in his body, weakness in his legs, and frequent headaches.  He had difficulty standing in the shower and reported numbness in his hands and feet and that he had worsening anxiety.  He reported frequent falls, gait problems, poor sleep and memory problems.  The MRI of his brain showed

no significant disease.  R. 286.  On examination, Rumpf was in no apparent distress; he was alert and oriented, with normal attention, recent and remote memory, concentration, speech, and a fund of knowledge; his upper extremity strength was 4/5 and his lower extremity strength was 5-/5; he had no abnormal movements; he had normal muscle tone and normal coordination; he had an antalgic gait.  Dr. Hake found no clear etiology for Rumpf's symptoms and stated that Rumpf could have fibromyalgia, cervical stenosis, myopathy, or peripheral neuropathy.  R. 289.

On May 2, 2017, Rumpf saw Dr. Richardson.  He walked with a stiff unsteady gait.  Dr. Richardson stated Rumpf's condition met the criteria for chronic fatigue syndrome. R. 328.  On examination, Rumpf was in no acute distress and was comfortable. Dr. Richardson assessed chronic fatigue, unspecified.  R. 329.

On May 5, 2017, Rumpf had an MRI of his brain.  The MRI showed normal osseous structures and no cord signal abnormality.  The radiologist's impression was small protrusions with near ventral cord abutment at C5-6 and C6-7, and uncovertebral spurring with mild left C3-4 foraminal stenosis.  R. 296-97.

On June 1, 2017, Rumpf saw a mental health counselor Tracy Prow, L.C.P.C.  Prow's mental status examination showed that Rumpf's affect

was normal, his thought process was normal, and his psychiatric condition was stable.  He also had no homicidal or suicidal thoughts.  R. 388.  Rumpf was friendly and talkative; his mood was pleasant and hopeful.  He said he had been divorced for four years and was the father of five children.  He had custody of the children every other weekend and one night through the week.  His parents and siblings lived in Detroit, Michigan and he had a close relationship with them.  He was involved with Scouting with his sons. He was taking over-the-counter medicine for his pain, although he took some of his sister's tramadol the week before.  R. 388.

On June 15, 2017, Rumpf had a nerve conduction / electromyogram (EMG) study of his upper extremities and left lower extremities.  The results were normal with no evidence of neuropathy or radiculopathy.  R. 301.

On June 27, 2017, Rumpf saw Dr. Zhen Ren, M.D., Ph.D., at the Washington University Physicians Department of Internal Medicine Division of Allergy & Clinical Immunology for a follow up for chronic fatigue syndrome and evaluation of his immune system.  R. 305.  His main complaints were fatigue and feeling weak.  Dr. Ren noted that Rumpf's physicians ran numerous tests for possible causes that all showed normal results except for an abnormal strep test and an allergy skin test that was positive for molds, dust mites, and mice.  R. 305.  On examination, Rumpf

was in no acute distress and his physical exam was normal.  Dr. Ren gave Rumpf a pneumococcal vaccine 23 injection and said the immunodeficiency evaluation was ongoing and instructed Rumpf to return in six weeks.  R. 306.

 On August 1, 2017, Rumpf again saw mental health counselor Prow. Prow's mental status examination was the same as on June 1, 2017.  Prow stated, "The patient appears to be determined to have poor physical health to cope with his grief and resentment following his divorce."  R. 390.

On August 5, 2017, Rumpf prepared a Function Report—Adult form (Function Report).  R. 216-23.  Rumpf lived by himself in an apartment and said he was limited by "pain in all of my joints & chronic fatigue."  R. 216. In a typical day, he took about half an hour to get out of bed, then dressed, made breakfast, and ate.  He watched television and then made lunch. After lunch he rested and then made dinner and rested.  He watched television and then went to bed.  R. 217.

Rumpf had his children on the weekends and he provided meals for his children at those times.  He had trouble falling asleep and staying asleep due to pain.  He woke up several times at night and took 30 to 60 minutes to fall back asleep.  As a result, he was tired during the day and took frequent naps.  R. 217.

Rumpf checked the box on the Function Report that he had no problems with personal care.  He stated, however, that he took "considerable" time to dress and usually sat on the floor to shower due to fatigue.  He also was "tired out" if he stood at the kitchen counter for more than five minutes and took "awhile" to get off the toilet.  R. 217.

Rumpf used reminders on his phone for meetings and to take medicine.  He spent 20 to 35 minutes a day preparing meals of frozen foods, cereal, and sandwiches.  Rumpf did his own laundry and housecleaning.  These activities took "most of the day due to frequent breaks and rest."  R. 218.  He went to church, the store, and doctors' appointments.  He could go out alone, and he drove.  He shopped once a week for an hour and used the cart as a walking aid.  He could pay bills, count change, and handle savings and checking accounts.  R. 219.  Rumpf listed his hobbies and interests as movies, television, "Scouting/Boy Scouts," and swimming, but he could only swim for five minutes.  He also camped, using a motorized vehicle to go from his campsite to other locations and back.  Rumpf talked to his parents daily over the phone and went to church on a weekly basis.  R. 220.

Rumpf stated that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete

tasks, concentrate, and use his hands.  He estimated that he could lift 10

pounds, walk or stand for 10 to 15 minutes, and pay attention for 15 to 20

minutes.  He had no problems following written instructions, but had some

problems with spoken instructions.  He got along well with authority figures

and could handle changes in routine, but he could not handle stress well.

He used a cane to walk.  R. 221-22.

On October 16, 2017, Rumpf saw state agency physician Dr. Vittal

Chapa, M.D., for a consultative examination.[2]  Rumpf said he had

fibromyalgia and chronic fatigue syndrome and his fatigue was getting

worse.  He had difficulty getting up in the morning, and he slept often

during the day.  He reported widespread pain and started using a "self-

prescribed" cane for the last month.  R. 376.  On examination, Rumpf was

73 inches tall and weighed 171 pounds.  He could bear weight and

ambulate without assistive devices; he had no motor weakness or muscle

atrophy; his sensation was intact; he had no evidence of joint redness,

heat, swelling, or thickening; he had no paravertebral muscle spasms.

Rumpf's grip strength was 5/5 and he could perform both gross and fine

---

[2] Dr. Chapa erroneously stated that the examination occurred on October 16, 2016.  R. 376.  The index of exhibits states that the examination was on October 16, 2017.  Dr. Chapa also noted that he reviewed medical records from April 26, 2017 to May 2, 2017, and that Rumpf quit smoking in March 2017.  R. 376. In addition, the attached handwritten medication list is dated October 16, 2017.  R. 379.  The Court finds that Dr. Chapa performed the examination on October 16, 2017.

manipulations with both hands.  Lumbosacral spine flexion was normal.
Straight leg raising tests were negative.  Rumpf had full range of motion in
all joints.  Dr. Chapa concluded that the physical examination was
unremarkable.  He said that Rumpf "was tender all over with no specific
trigger points."  R. 378.

On October 24, 2017, Rumpf saw state agency psychologist Dr.
Frank Froman, Ed.D., for a mental status examination.  Rumpf reported
that he had a "very unsteady gait."  He held onto walls when he walked and
fell often.  He reported very low energy.  R. 382.  Rumpf moved slowly and
his mood and affect were slightly dysthymic.  His ability to relate was good;
he liked to talk; his eye contact was good.  He was neither homicidal nor
suicidal and performed his own self-care and household chores.  Rumpf
was oriented and in good contact with reality.  He could add and subtract
but could not multiply.  His estimated IQ was average.  Dr. Froman
assessed chronic mild major depressive disorder, anxiety disorder, history
of attention deficit hyperactivity disorder (ADHD).

Dr. Froman concluded:

> **CONCLUSIONS:**  Dan's unsteadiness makes it unlikely for him
> to be able to perform one and two step assemblies in a
> competitive rate.  Also, the issues of his fatigue ability which
> presents itself as "easily falling asleep," regardless of external
> issues.

He can relate well to others, can still follow oral and written instructions, and can manage benefits. He will have significant difficulty withstanding the stress associated with customary employment because of his chronic fatigue.

Further, he acknowledges "daily panic attacks," something for which he says has never been treated. I strongly suspect that there is encroaching agoraphobia occurring, with little interest on his part of looking at an externalized life.

R. 384.

On October 27, 2017, state agency physician Dr. Sumanta Mitra, M.D., prepared a Physical Residual Functional Capacity Assessment. Dr. Mitra opined that Rumpf could occasionally lift 20 pounds and frequently lift 10 pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. Dr. Mitra opined that Rumpf could frequently climb ramps, stairs, ropes, ladders, and scaffolds and found that Rumpf had no other postural limitations. Dr. Mitra found that Rumpf should avoid concentrated exposure to extreme heat or cold; wetness; fumes, odors, dusts, gases, and poor ventilation; and hazards. R. 81-83.

On the same day, October 27, 2017, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique for Rumpf. Dr. Mehr found that Rumpf had mental impairments within the categories of depressive, bipolar, and related disorders; anxiety and obsessive-

compulsive disorders; and neurodevelopmental disorders.  Dr. Mehr found that these mental disorders caused only mild functional limitations and opined that Rumpf's mental impairments were non-severe.  R. 79.

On January 17, 2018, state agency psychologist Dr. Leslie Fyans, Ph.D., prepared a Psychiatric Review Technique for Rumpf.  Dr. Fyans agreed with Dr. Mehr that Rumpf's mental impairments were non-severe. R. 93.

On January 24, 2018, state agency physician Dr. Calixto Aquino, M.D., prepared a Physical Residual Functional Capacity Assessment for Rumpf.  Dr. Aquino agreed with Dr. Mitra's assessment of Rumpf residual functional capacity.  R. 94-97.

On February 14, 2018, Rumpf again saw Dr. Richardson.  He reported that his depression was controlled for the most part.  He was sleeping six to 10 hours a day and still constantly felt exhausted.  He still had pain in his hips and lower extremities and had difficulty standing more than five minutes.  He reported a tremor with fine activities.  Dr. Richardson noted, "I'm afraid there is nothing else I have to offer him at this point.  I did discuss getting an opinion at the Mayo Clinic and he would like to proceed." R. 392.  On examination, Rumpf was alert and oriented with normal

judgment, insight, affect, and mood.  Dr. Richardson planned to check on

referring Rumpf to the appropriate department at the Mayo Clinic.  R. 394.

On May 24, 2018, Rumpf saw nurse practitioner Anita L. Arnold, NP,

in the office of neurosurgeon Dr. Mark Gold, M.D.  Rumpf started having

neck and right shoulder pain in March 2018.  The pain started in his neck

and radiated to his right hand.  The pain ranged from 5/10 to 10/10.  R.

437.  On examination, Rumpf was uncomfortable but in no acute distress;

his muscle bulk was normal; he had cervical muscle spasms in his back

and bilateral anterior scalene tenderness.  He was alert, oriented, and his

recent and remote memory were intact; he had normal attention; his gait

was normal, and his tandem gait was normal; his sensation was intact.  His

triceps strength was 4-/5 on the right and 4/5 on the left, and his grip

strength was 3+/5 on the right and 4-/5 on the left.  Arnold noted that an

MRI done on April 18, 2018, showed left neural foraminal stenosis severe

at C3-4, central disc protrusion with mild cord compression at C5-6, mild to

moderate central with severe right neural foraminal stenosis secondary to a

disc herniation at C6-7.  Arnold assessed cervical stenosis with cord and

root compression and cervical spondylosis.  R. 438-39.  Dr. Gold

recommended a microdiscectomy and fusion at C6-7.  R. 439.

On June 29, 2018, Rumpf had an appointment with Dr. Nathan P. Seaman, D.O., to establish primary care.  R. 442.  Dr. Seaman noted that Rumpf "has current disability for fibromyalgia."  Rumpf reported that he could not take certain medications and other medications did not work or had too many side effects, except naproxen helped with the pain.  On examination, Rumpf was in no acute distress; his affect was full and his mood was pleasant; he could ambulate without an assistive device; he had multiple tender points all over his body; he was hypersensitive to touch.  Dr. Seaman referred Rumpf to behavioral health.  R. 442-43.

On August 17, 2018, Dr. Gold performed the surgery on Rumpf's cervical spine at C6-7. Rumpf was discharged in stable condition the next day.  R. 461-62.

On August 30, 2018, Rumpf saw nurse practitioner Arnold for a post-operative check.  Rumpf reported improvement in overall pain.  He had soreness in his neck muscles and bilateral shoulder pain.  His dysphagia was improving.  Rumpf denied any injuries or falls.  On examination, the incision was healing.  Rumpf had cervical tightness without spasms; his upper extremity strength was improving; strength in his deltoids, biceps, triceps, and grips were intact; his neuropathic pain was minimal; his gait

was steady, and his cranial nerves were intact.  Arnold assessed healing cervical fusion and healing radiculopathy.  R. 470.

On September 18, 2018, Rumpf saw counselor Joseph J. Poyser, L.C.P.C., for counseling and treatment.  Rumpf reported that he has had depression and anxiety for seven years.  He also reported fatigue throughout the day.  On examination, Rumpf had an unkempt appearance; he had normal attention span and concentration; he had no agitation; he was engaged and cooperative.  He was oriented, his mood was depressed, and his affect was congruent.  His thought process was linear with no suicidal or homicidal ideations; his insight and judgment were fair, and his memory was intact.  Poyser assessed generalized anxiety disorder and persistent depressive disorder.  R. 602.

On September 27, 2018, Rumpf saw nurse practitioner Arnold for a post-operative check.  He reported doing better and that his pain overall was well-controlled.  He had intermittent cramping and tightness in his neck, but denied any injuries or falls.  He continued to be hoarse.  On examination, Rumpf had cervical tightness without spasms.  His gait was steady; his strength was 5/5 bilaterally in his upper and lower extremities. He was alert and oriented. His cranial nerves were intact, and he had minimal neuropathic pain.  R. 474.  Arnold instructed Rumpf to continue

range of motion exercises and to take a 30-minute walk every day. Arnold put Rumpf on a 30-to-40-pound weight restriction as long as the weight was comfortable. She told Rumpf to avoid ladders and referred him to speech therapy for his hoarseness. R. 475.

On September 28, 2018, Rumpf saw Dr. Seaman. He reported extreme fatigue, joint and muscle pain, and insomnia/trouble staying asleep. He reported pain in his hips, knees, arms, and the bottoms of his feet. R. 479. On examination, Rumpf was no acute distress, his affect was full, and his mood was pleasant. He could ambulate without an assist. Dr. Seaman assessed fibromyalgia, generalized anxiety disorder, and depressive disorder. R. 480.

On December 20, 2018, Rumpf saw nurse practitioner Arnold for a post-operative follow up examination. He reported that he was doing well and his pain overall was well controlled. He still had issues with his fibromyalgia. Rumpf denied that he had any injuries or falls. R. 562. On examination, Rumpf had cervical tightness without spasms. His gait was steady and his upper and lower extremity strength was intact. Arnold noted minimal if any neuropathic pain. R. 562. Arnold instructed Rumpf to avoid activity that could injure his neck or back. R. 563.

On February 27, 2019, Dr. Seaman prepared a Medial Source Statement of Ability to do Work-Related Activities (Physical) form.  R. 669-72.  Dr. Seaman opined that Rumpf could lift less than ten pounds, either frequently or occasionally; stand and walk less than two hours in an eight-hour workday; sit for a total of less than two hours in an eight-hour workday; sit for 20 minutes at one time; and stand for five minutes at one time.  Dr. Seaman said that Rumpf would need to walk around very frequently during a workday for about 15 minutes each time.  He would need to lie down two to three times per hour at unpredictable intervals during an eight-hour workday.  Dr. Seaman stated the medical findings that supported the described limitations as, "Only per symptom report from patient with severe fibromyalgia."  R. 669.  Dr. Seaman opined that Rumpf could occasionally twist, stoop or bend, and climb stairs; and could never crouch or climb ladders.  Dr. Seaman stated the medical findings that supported these opinions as, "Patient history. Weak and unsteady fatigues very easily—pain with movement."  R. 670.  Dr. Seaman stated that Rumpf could occasionally reach, handle, feel, push, and pull; and never finger.  Dr. Seaman stated the medical findings that supported these opinions as, "Reports has shaky hand and decrease feeling in hands."  R. 670.  Dr. Seaman opined that Rumpf had to avoid all exposure to extreme cold and

heat; high humidity; fumes, odors, dusts, gases; perfumes; soldering fluxes; solvents; cleaners; and chemicals.  Dr. Seaman stated the medical findings that supported these opinions as, "Extreme temps or noxious smells exacerbate fibromyalgia."  R. 671.  Dr. Seaman stated that if Rumpf worked fulltime, he would miss more than four days a month and would be off-task 25% when he was at work.  He would need two to three unscheduled breaks per hour at work, with each break lasting 10 to 15 minutes.  Dr. Seaman attributed the need for breaks to muscle weakness; chronic fatigue, pain, paresthesia, and numbness.  Dr. Seaman agreed that Rumpf's disability began on the Onset Date.  R. 671-72.

<u>The Evidentiary Hearing</u>

On March 18, 2019, the Administrative Law Judge conducted an evidentiary hearing.  Rumpf appeared in person and with his attorney. Vocational expert Robin Cook also appeared by telephone.  R. 34.

Rumpf testified that he lived alone in an apartment and had custody of his children on assigned weekends.  R. 38-39.  He stopped working in April 2017 because his "fibromyalgia and chronic fatigue syndrome was so bad that I couldn't complete a week's worth of work."  R. 40.

Rumpf said he had headaches one to three times a month.  Each headache lasted one to three days.  He was sensitive to light and sound.

R. 40.  He slept in a dark room when he had a headache and his headaches caused blurry vision.  The headaches improved since April 2017.  In April 2017, he had headaches one to three times a week.  Each headache still lasted one to three days.  R. 41.

Rumpf had neck problems that resulted in the August 2018 surgery. He felt a pop in his neck one morning in April 2018 and the pain felt similar to the pain caused by hitting one's elbow.  The pain was continuous and increasing.  After his neck surgery in August 2018, Rumpf said that he still had muscle spasms every day once or twice a day.  Each spasm lasted 30 to 45 minutes.  R. 42.  The muscles became tight and then spasmed.  The spasms started at the base of the skull and extended to just below the shoulder blade.  He had no strength during a spasm and took medication to treat the spasm. The medication made him sleepy and he usually took a nap for one to three hours after taking the medicine.  R. 43.

Rumpf testified that he had spasms in his shoulders also.  The spasms were part of the spasms in his neck.  He had stiffness, soreness, fatigue, and weakness in his shoulders.  These symptoms extended into both of his arms down to the tips of his fingers.  Physical activity made the symptoms worse, but muscle relaxants made the symptoms better.  The muscle relaxants took 30 to 45 minutes to work.  He took a nap after taking

the muscle relaxants.  His surgery got rid of the pinched nerve pain, but he had more stiffness in his shoulder.  R. 44-45.

Rumpf experienced problems with his arms since the Onset Date. The pain has gotten worse over time and the pain and weakness were all over his arms.  Rumpf said that his doctors told him this pain was fibromyalgia and chronic fatigue syndrome.  Rumpf said he had stiffness and tremors in his hands and he dropped things two to three times a day. He had tremors in both hands daily that lasted one to three hours.  He could not write when he had a tremor.  R. 45-47.

Rumpf said that he also had daily sharp, stabbing pain in his lumbar spine by his hips and also in his upper back.  The severity of the pain varied and he had worse pain one to three times a week.  Physical activity made the pain worse.  Rumpf said he could walk 50 to 100 yards before he got "to hurting and tired."  After walking such a distance, Rumpf needed to rest for one to three hours.  The back pain daily radiated into Rumpf's legs and went from his hips down through his toes.  Rumpf described the leg pain as, "Stiffness, soreness, just really bad pain, stabbing pain."  The leg pain had gotten worse since the Onset Date.  R. 47-50.  About once a month, Rumpf used the cane to walk.  He used a cane whenever he had a "fibro flair."  He did not use the cane when he left home.  R. 50-51.  He had

numbness and tingling in his feet and every day Rumpf hit objects with his feet but he did not feel the impact.  R. 51.

Rumpf said his depression caused sadness and loneliness and he had thoughts daily of hopelessness and worthlessness.  Due to his depression and pain, Rumpf did not want to get out of bed in the morning. He stayed in bed in the morning one to three times a week.  His depression was about the same as it was on the Onset Date.  R. 51-52.

Rumpf's anxiety felt "like everything's closing in on me, the room's getting smaller."   He said he got "heart palpitations and heavy breathing, sweating."  Changes in routine caused anxiety, as well as socializing with people.  Rumpf had panic attacks one to three times a week with each attack lasting for one to two hours.  Rumpf retreated to a safe, comfortable place when he had a panic attack.  He sometimes felt anxious while he engaged in scouting activity with his children.  About once a month, he could not participate in scouting activities due to his anxiety.  R. 52-54.

Rumpf testified that he had memory problems.  Three to five times a day, he could not remember where he placed items such as his keys or a remote control.  He also had problems with word recall every other day.  R. 54-55.

Rumpf's medications included gabapentin, Flexeril, and Lyrica. The gabapentin and the Flexeril made Rumpf sleepy, and the Lyrica gave him blurry vision which lasted up to an hour. Rumpf took Lyrica three times a day, and the blurry vision occurred every time he took it. R. 55-56. Rumpf also used heating pads and ice packs to relieve his pain. He used the heating pads once or twice a month. R. 56-57.

Rumpf drove a car and stated he could drive for 30 minutes before he had to stop and stretch. He did laundry two to three times a week and took a nap after folding clean laundry. He sat on a barstool while washing dishes and lay down after washing a week's worth of dishes. R. 57-59.

Rumpf said he had not attended church in a year. He did not go due to pain, anxiety, and depression. R. 59.

Rumpf went camping with his sons' scout troop. He used a golf cart to get from place to place while camping and he needed help to put up a tent. He slept on a pad on the ground. After one night's camping, Rumpf had "a lot of pain" for three to four days. He stayed in bed for three days. R. 60-61.

Rumpf showered or bathed twice a week. He sat in the shower because standing was too difficult and getting in and out of a tub was also difficult. R. 61-62.

Rumpf needed medication to fall sleep, but even with medication, he had difficulty falling asleep.  Once asleep, his pain usually woke him up one to three times a night.  He took 10 minutes to two hours to fall back asleep. He went to bed no later than midnight, and got up about noon or after.  R. 63-64.  He also took one or two naps during the day.  Each nap lasted one to two hours.  R. 63-64.

Rumpf testified that he could sit for 10 to 20 minutes and stand for 10 to 20 minutes.  He could lift, "Maybe 10, 20 if that."  Rumpf clarified that he could lift 20 pounds maybe once, but not on a continual basis.  He would need assistance getting back up if he kneeled, crouched down, or bent over.  R. 64-65.

Vocational expert Cook testified.  Rumpf's counsel had no objection to Cook testifying as a vocational expert.  R. 65-66.

The ALJ asked Cook the following hypothetical question:

Q Okay. All right, I'd like you to assume a hypothetical individual the Claimant's age and education with the past jobs that you described.

Further, assume that this individual is limited to work at the sedentary exertion level, can frequently reach, handle, finger, and feel, but can never climb ropes, ladders, or scaffolds. Can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl.

Can have no exposure to unprotected heights or hazardous machinery. Can have no concentrated exposure to

extreme heat, extreme cold, humidity, and respiratory irritants such as dust, fumes, odors, gases, and poor ventilation.

Is able to perform simple routine tasks, but can have only minimal changes in job setting and duties. Can the hypothetical individual perform any of the Claimant's past work?

R. 68-69. Cook opined that such a person could not perform Rumpf's past relevant work. Cook opined that such a person could perform other jobs in the national economy, including a semiconductor bonder, with 22,470 such job in the nation; taper circuit layout, with 9,400 such jobs in the nation; and a label pinker with 14,150 such jobs in the nation. R. 70.

If the person needed additional unscheduled breaks during the workday, the person could not work. The person also could not work if he was off-task 15 percent of the time at work. The person could not work if he was absent more than once a month. The person also could not work if he had to lie down during the workday even during breaks. R. 71-73. The hearing concluded.

## THE DECISION OF THE ALJ

On June 12, 2019, the ALJ issued her decision. R. 15-27. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to

have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§

404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir.

2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Rumpf met his burden at Steps 1 and 2.  Rumpf

had not engaged in substantial gainful activity since the Onset Date.  He

had the severe impairments of fibromyalgia, chronic fatigue syndrome,

headaches, allergic rhinitis, degenerative disc disease status post C6-7

fusion surgery, mood disorder, and anxiety disorder.  R. 18.  The ALJ found

at Step 3 that Rumpf's impairments or combination of impairments did not

meet or equal a Listing.  R. 18-20.

Before reaching Step 4, the ALJ found that Rumpf had the following

RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform sedentary work as defined in 20 CFR 404.1567(a)
> except that the claimant can frequently reach, handle, finger,
> and feel, but can never climb ropes, ladders, or scaffolds; can
> only occasionally climb ramps and stairs, balance, stoop, kneel,
> crouch, and crawl; can have no exposure to unprotected
> heights or hazardous machinery; can have no concentrated
> exposure to extreme heat, extreme cold, humidity, and
> respiratory irritants such as dust, fumes, odors, gases, and poor
> ventilation; and is able to perform simple, routine tasks, but can
> have only minimal changes in job setting and duties.

R. 20.  The ALJ relied on medical examinations that showed some

weakness; the normal examination by Dr. Chapa; the normal brain MRI and

normal nerve conduction/EMG study; the mental status examination notes

from counselor Poyser and Dr. Froman that showed largely normal thought processes, insight, and judgment, and intact memory; the post-operative examination notes that showed normal strength, a steady gait, pain that was well-controlled, and a weight restriction of 30 to 40 pounds.  R. 23-24.

The ALJ found that Rumpf's statements about the severity of his symptoms were inconsistent with his Function Report which indicated that he took care of his children on the weekends, prepared meals, did laundry, cleaned, drove, shopped, managed his own finances, spent time with others, and went to church regularly.  The ALJ also found that his description of his symptoms was inconsistent with the medical examination record.  R. 24.

The ALJ discounted Dr. Seaman's 2019 opinions that were not supported by the medical evidence in the records and were not consistent with the medical evidence in the record.  The ALJ noted that Dr. Seaman said the opinions were based on the report of Rumpf rather than medical observations.  The ALJ also noted that Dr. Seaman's September 2018 notes stated that Rumpf was in no acute distress and could ambulate without assistance.  The opinions were also not supported by the normal brain MRI and the normal nerve conduction/EMG study.  The ALJ found the opinions were not consistent with the post-surgery findings of full strength,

a steady gait, and intact grip.  The ALJ concluded that Dr. Seaman's opinions were not persuasive.  R. 25.

The ALJ found Dr. Froman's comments about Rumpf's inability to work due to his physical condition was not persuasive because Dr. Froman was a psychologist, and so, was not qualified to opine on the functional effect of physical impairments.  The ALJ relied on Dr. Froman's mental status examination that found Rumpf could relate well, had good eye contact, could add and subtract, had normal attention span and concentration, and had an intact memory.  R. 24-25.

The ALJ found that the opinions of state agency Drs. Mitra and Aquino, and psychologists Drs. Mehr and Fyans were not persuasive because the opinions did not consider the records of examinations, tests, and treatments that occurred after the dates of their opinions.  R. 25.

The ALJ concluded regarding the RFC determination:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. The consistency of the claimant's allegations is weakened by inconsistencies between the claimant's allegations, the claimant's statements regarding daily activities, and the medical evidence. The claimant does experience some limitations but only to the extent described in the residual functional capacity above.

R. 26.  Upon determining Rumpf's RFC, the ALJ found at Step 4 that he could not perform his past relevant work.  R. 26.

At Step 5, the ALJ found that Rumpf could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Cook that a person with Rumpf's age, education, work experience, and RFC could perform the representative jobs of semiconductor bonder, taper printed circuit layout, and label pinker.  R. 26-27.  The ALJ concluded that Rumpf was not disabled.

Rumpf appealed.  On May 27, 2020, the Appeals Council denied Rumpf's request for review.  The decision of the ALJ then became the final decision of the Defendant Acting Commissioner.  R. 1.  Rumpf then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the decision of the ALJ was supported by substantial evidence.  The ALJ cited several medical records to support the RFC finding.  The ALJ cited Rumpf's MRIs and other imaging showed mild problems, except for the cervical problem that was corrected by surgery. The nerve conduction/EMG study was normal.  Dr. Chapa found no motor weakness, intact sensation, normal grip strength, full range of motion, no joint swelling, a negative straight leg raising test, and the ability to perform fine and gross manipulations.   Rumpf told nurse practitioner Arnold after his neck surgery that his pain was overall well controlled.  On examination,

Arnold found no muscle spasms, and Rumpf's gait was steady.  Arnold also put Rumpf on a 30 to 40 pound weight limit.  In September 2018, Dr. Seaman noted on examination that Rumpf was in no acute distress and he could walk without assistance.  R. 21-23.

The ALJ also relied on the mental status examinations of Dr. Froman and counselor Poyser, as well as the mental status findings of Dr. Richardson at the February 14, 2018 examination.  The ALJ found that these examinations showed Rumpf was oriented, he had normal attention span and concentration, intact memory, and at least fair insight and judgment.  The examinations also showed that Rumpf could relate well with others and could maintain good eye contact.  Dr. Froman also noted that Rumpf could add and subtract easily.  R. 22-23.

The ALJ also considered Rumpf's statements about the severity of his symptoms.  The ALJ found that the statements were not consistent with the medical evidence.  The ALJ gave specific examples including the MRIs, the nerve conduction/EMG study, Dr. Chapa's examination results, and nurse practitioner Arnold's post-surgery examination findings.  The ALJ also found that the statements were not consistent with Rumpf's descriptions of his activities in his Function Report.  R. 24.  The Court agrees that Rumpf's testimony was contrary to the medical evidence,

particularly the examinations of Dr. Chapa and nurse practitioner Arnold.

Dr. Chapa and nurse practitioner Arnold, together, found no muscle

spasms, normal strength, normal range of motion, a steady gait, and

normal ability to perform fine and gross manipulations.  The evidence relied

on by the ALJ provided substantial evidence to support the RFC finding.

Rumpf complains that the ALJ mischaracterized his descriptions of

his activities in the Function Report.  The Court agrees that the ALJ left out

details.  Overall, however, Rumpf reported engaging in more activity in the

Function Report than he did in his testimony.  Given that Rumpf's testimony

was inconsistent with the medical evidence, particularly the later

examinations after his surgery, and at least somewhat inconsistent with the

Function Report, the Court finds that the ALJ's consideration of Rumpf's

statements of the severity of his symptoms was supported by substantial

evidence.

The ALJ found that Dr. Seaman's 2019 opinions were not persuasive.

The ALJ provided substantial evidence to support this assessment.  The

ALJ found that the opinions were not supported by medical evidence and

were not consistent with the evidence in the record.  The ALJ noted that Dr.

Seaman found in September 2018 that Rumpf was in no acute distress and

could ambulate without assistance.  The ALJ also found Dr. Seaman's

opinions inconsistent with the MRIs and other imaging, nerve conduction study, Dr. Chapa's findings, and the findings of nurse practitioner Arnold after the neck surgery. The ALJ also noted that Dr. Seaman stated that several of the opinions were based on Rumpf's report of symptoms and not medical examination findings.

Rumpf argues that the ALJ erred by not addressing all the factors in the regulations for evaluating medical opinions. The Court sees no error. The regulations list four factors and four sub factors used in evaluating medical opinions. 20 C.F.R. § 404.1520c(c). The regulations, however, also state that the ALJ is only required to discuss two factors in her findings, supportability and consistency. 20 C.F.R. § 20C.F.R. § 404.1520c(b)(2). The ALJ discussed these two factors. As discussed above, her consideration of these two factors was supported by substantial evidence. The Court will not find error when the ALJ followed the regulations.

The ALJ also found Dr. Froman's opinions that Rumpf would have difficulty maintaining employment because of his unsteadiness and fatigue were not persuasive. The ALJ found that opinions about limitations due to physical impairments were not within Dr. Froman's expertise as a psychologist. The Court finds no error in the ALJ's observation. Dr.

Froman is a psychologist, and so, lacked the expertise to opine on functional limitations due to physical impairments.  The ALJ also credited Dr. Froman's mental status examination findings and relied on those findings.  The Court finds no error in the ALJ's treatment of Dr. Froman's opinions.[3]

Rumpf argues that the ALJ erred in formulating the RFC because she did not rely on an expert opinion and she was not competent to formulate an RFC.  The Plaintiff's counsel asserts the ALJ was a layperson, and so, was not competent to review medical records and other evidence in the record to formulate an RFC.  The Court again finds no error.  The regulations provide that "the final responsibility for determining your RFC is reserved to the commissioner." Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)).  Further, the regulations authorize and direct the ALJ to assess the claimant's RFC in a case, such as this one, in which the claimant requested an evidentiary hearing.  20 C.F.R. § 404.1546(c); see).  The ALJ, therefore, was authorized to formulate the RFC without resort to a specific medical opinion.  The ALJ

---

[3]The ALJ also considered the opinions of Drs. Mitra and Aquino, and psychologists Drs. Mehr and Fyans. The ALJ found their opinions not to be persuasive.  Rumpf does not challenge this finding.

also was not required to rely on a specific medical expert opinion in doing so.  <u>Schmidt v. Astrue</u>, 496 F.3d 833, 845 (7th Cir. 2007).[4]

In this case, the ALJ reviewed the record and formulated a highly restrictive RFC.  She limited Rumpf to a limited range of sedentary work.  Her decision that Rumpf could perform such a limited range of jobs was supported by substantial evidence for the reasons set forth above.  There was no error in the ALJ performing her duties under the regulations.

Rumpf urges the Court at various points in his Motion to reweigh the evidence.  This the Court cannot do. <u>Jens</u>, 347 F.3d at 212; <u>Delgado</u>, 782 F.2d at 82.

Rumpf finally argues incorrectly that he has a property interest in Disability Benefits.  He does not.  A person has a property interest in Disability Benefits <u>after</u> such benefits have been awarded to the person.  Once Disability Benefits are awarded, a person is entitled to receive due process before those benefits may be terminated.  <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. 319, 332 (1976).  The Commissioner has not awarded Disability Benefits to Rumpf so he does not have a property interest.

---

[4]Rumpf's complaint is with the process established by statute and regulations.  Arguments for changes in the statutory and regulatory process should be addressed to Congress and the Commissioner, not the Courts.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Acting Commissioner's Motion for Summary Affirmance (d/e 19) should be ALLOWED, Plaintiff Daniel P. Rumpf's Brief in Support of Motion for Summary Judgment (d/e 15) should be DENIED, and the decision of the Acting Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   January 3, 2022

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE